UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------x
MACIEJ KORALEWSKI,

                                        Plaintiff,                                    22-CV-04751 (DG) (SJB)

                    -against-                                                    AMENDED COMPLAINT

BLACKSTONE LABS LLC, PHILLIP BRAUN and
RICHARD NEWTON,
                                        Defendants.
-------------------------------------------------------------------------------x

       Plaintiff MACIEJ KORALEWSKI ("Plaintiff"), by and through his undersigned

attorneys, SABAJ LAW, P.C., in his capacity as the surviving spouse and as the authorized

personal representative of MALGORZATA HALAS-KORALEWSKA, Deceased, as and for his

Amended Complaint herein, following the removal of the action from State Court to Federal

Court, complains of Defendants and alleges as follows:

## PRELIMINARY STATEMENT

1.  Plaintiff commenced this action against Defendants on June 27, 2022 in the Supreme Court

of the State of New York, County of Kings, following which the action was removed to this Court

on August 12, 2022. Plaintiff brings this action against Defendants seeking monetary damages

predicated on Defendants having knowingly sold, marketed and distributed products labelled as

"dietary supplements," including one known as "ANOGENIN," which Defendants knew to be

illegal under Federal Law, and which Defendants knew to contain both undisclosed and illegal

substances, not in the nature of "dietary ingredients."

2.  In doing so, Defendants knowingly defrauded and misled both the FDA and consumers,

among them Plaintiff's now deceased wife, callously disregarding health risks and consequences

to consumers of their products, and it is a matter of public record that they did so on a widespread

basis, throughout the United States and internationally, in connection with numerous products, resulting in Defendant BLACKSTONE LABS LLC ("BLACKSTONE") and Defendant PHILLIP BRAUN ("BRAUN") (among others) being indicted by the Federal Government for Conspiracy to Defraud the FDA, for the Introduction of Unapproved New Drugs Into Interstate Commerce, and Conspiracy to Manufacture and Distribute a Controlled Substance, charges for which it is a matter of public record that Defendant BLACKSTONE and Defendant BRAUN both pleaded GUILTY to Conspiracy to Distribute Controlled Substances and to the Sale of Unapproved New Drugs, and for which Defendant BLACKSTONE also pleaded GUILTY to Conspiracy to Defraud the FDA and to Mail and Wire Fraud. (see U.S. Department of Justice Press Release No. 21-1157 dated November 19, 2021). In pleading GUILTY to such charges, Defendant BLACKSTONE and Defendant BRAUN both expressly admitted that BLACKSTONE had been formed "for the specific purpose of obscuring the sale of products marketed as dietary supplements that were tainted with anabolic steroids and therefore could not lawfully be sold."

3.  In the case of the product known as "ANOGENIN," for it to have been legally labelled, marketed, distributed and sold as a "dietary supplement" under Federal Law (including but not limited to the Food, Drug and Cosmetic Act), it had to contain legal "dietary ingredients" and be bereft of illegal substances. However, Defendants illegally labelled, marketed, distributed and sold "ANOGENIN" to consumers, including Plaintiff's now deceased wife, as a "dietary supplement" although knowing that it contained undisclosed, illegal and unsafe substances, including substances/drugs known as DHCMT Metabolite and Metandienone. Indeed, it is a matter of public record that ANOGENIN was among the products seized by the Federal Government from Defendant BLACKSTONE's premises in connection with its prosecution of BLACKSTONE and a number of its executives, among them BRAUN.

2

4.   Plaintiff brings this action on behalf of his deceased wife, MALGORZATA HALAS-KORALEWSKA, who was a prominent athlete and internationally ranked Para Powerlifter who was then training for her participation in the Tokyo 2020 Paralympic Games, and had purchased in 2018 and used on a daily basis, as per its product labelling, what she understood to be the "dietary supplement" known as ANOGENIN, only to find out, on or about May 28, 2019, that a routine but required urine testing sample taken on April 26, 2019 at the site of the Eger 2019 Para Powerlifting World Cup in Eger, Hungary revealed the presence of an Anabolic Androgenic Steroid (AAS) known as DHCMT Metabolite in her system, which is a prohibited and banned substance by the World Anti-Doping Agency (WADA).

5.   By reason of having learned that her urine sample had tested positive for a banned AAS, and believing that the presence of the banned AAS could only have come from her using the "dietary supplement" known as ANOGENIN, Plaintiff's wife had a sealed container of ANOGENIN tested by an approved Polish Anti-Doping Testing Laboratory, the results of which testing revealed the presence, in the container of ANOGENIN, of both DHCMT and Metandienone , which substances/drugs are both banned Anabolic Androgenic Steroids (AAS).

6.   As a result of having tested positive for the banned substance known as DHCMT, which banned substance (along with Metandienone) was found to have been present in ANOGENIN, the so-called "dietary supplement" sold, marketed and distributed by Defendant BLACKSTONE, and purchased and used by Plaintiff's wife, Plaintiff seeks to hold Defendants liable for all of the damages that his now deceased wife suffered from Defendants' having knowingly sold, marketed and distributed ANOGENIN labelled as a "dietary supplement," which Defendants knew to be illegal under Federal Law, and which Defendants knew to contain both undisclosed and illegal substances, not in the nature of "dietary ingredients."

## JURISDICTION AND VENUE

7. The within action was removed to this Court from the Supreme Court of the State of New York, County of Kings on or about August 12, 2022, at the request of Defendants, pursuant to 28 U.S.C. Section 1441 and by reason of the fact that the Court has original jurisdiction over all of the claims asserted by Plaintiff in the within action, with complete diversity of citizenship among the parties existing and with the amount in controversy exceeding $75,000.00.

## THE PARTIES

8. Plaintiff MACIEJ KORALEWSKI ("Plaintiff") is a citizen and resident of Poland, he is the surviving spouse of MALGORZATA HALAS-KORALEWSKA, who died on July 10, 2021 at the age of 35, and he is the authorized personal representative of his late wife.

9. Defendant BLACKSTONE LABS LLC ("BLACKSTONE") is a Florida limited liability company with its principal place of business located at 1120 Holland Dr., Ste 14, Boca Raton, FL. 33487 and, at all times pertinent herein, BLACKSTONE was engaged in the business of selling, marketing and distributing products labelled and marketed as "dietary supplements," and doing so throughout the United States, including New York, and internationally.

10. Defendant PHILLIP BRAUN ("BRAUN") is a resident of Palm Beach County, Florida, he is a Co-Founder of BLACKSTONE and, at all times pertinent herein, he controlled and/or participated in the business operations of BLACKSTONE and its agents in the business of selling, marketing and distributing products labelled and marketed as "dietary supplements," and doing so throughout the United States, including New York, and internationally.

4

11. Defendant RICHARD NEWTON ("NEWTON") is a resident of the State of Florida and,

at all times pertinent herein, he was BLACKSTONE's Manager and he participated in the business

operations of BLACKSTONE and its agents in the business of selling, marketing and distributing

products labelled and marketed as "dietary supplements," and doing so throughout the United

States, including New York, and internationally.

## THE FACTS

### A. HISTORY OF THE CASE

12. At all times pertinent herein, Plaintiff's wife was a world-class athlete and prominent sports

figure who competed in Para Powerlifting and was a multiple time representative of Poland in that

sport discipline. Plaintiff competed in, and won, many international championships, including

having been a 7-time World Champion, an 11-time European Champion and the holder of 17

World Records.

13. At the time that the events at issue herein occurred, Plaintiff's wife was an internationally

top ranked Powerlifter who was then training for participation in the Tokyo 2020 Paralympic

Games. As such, Plaintiff's wife's performances were very important to her, both personally and

economically, since opportunities to increase her sports sponsorships and product endorsements

were dependent upon her success.

14. Sometime in 2018, Plaintiff's wife purchased containers of a product called ANOGENIN,

which was sold, marketed and distributed by BLACKSTONE as a "dietary supplement" and the

marketing and labelling of which product was represented by BLACKSTONE to "increase

metabolism" and "build strength and muscle" while being "plant-based," "natural," "completely

legal and safe," not containing any "prohormones and other androgenic products" and "does not

increase testosterone levels." The product's labelling, along with its marketing, identified Laxogenin as the primary ingredient, represented to be "natural" and "plant-based," and identified its other ingredients as being limited to: Magnesium Stearate, Silicon Dioxide and Titanium Dioxide.

15. Significantly, the product labeling and its marketing made no mention of and failed to disclose that ANOGENIN contained other substances, including but not limited to DHCMT and Metandienone.

16. Plaintiff's wife consumed BLACKSTONE's product ANOGENIN during the three (3) month period preceding April 26, 2019, consuming 1 capsule per day with meals in accordance with BLACKSTONE's labeling recommendations.

17. On April 26, 2019, at the site of the Eger 2019 Para Powerlifting World Cup in Eger, Hungary, where Plaintiff's wife was competing, and in fact had won her event on the preceding day, April 25, 2019, Plaintiff's wife was required to submit a urine sample for routine testing. To Plaintiff's wife's surprise and astonishment, she later learned, on or about May 28, 2019, that the urine testing from April 26, 2019 revealed the presence of DHCMT Metabolite in her system, which is a prohibited and banned substance classified as an Anabolic Androgenic Steroid (AAS) by the World Anti-Doping Agency (WADA).

18. Due to the results of the urine testing conducted of the sample taken on April 26, 2019, Plaintiff 's wife was deemed to have committed "anti-doping violations," as a result of which: she was disqualified by the governing bodies from competing in weightlifting competitions for a period of one (1) year; she was suspended as a member of the Polish National Team; prior results that she had achieved in competitions were nullified, including her First Place finish at the Eger 2019 Para Powerlifting World Cup on April 25, 2019; all points, medals and awards that she had

previously received were nullified and forfeited; and the determinations of the Polish Anti-Doping Agency were made public. The International Paralympic Committee, in doling out its penalties, concluded that the anti-doping rule violation had been <u>unintentional</u> on the part of Plaintiff's wife and that the source of the prohibited substance was her <u>unknowing</u> use of a <u>contaminated</u> <u>product</u>, specifically BLACKSTONE's product ANOGENIN.

19. As a direct result of having been disciplined for an Anabolic Androgenic Steroid having been found in Plaintiff's wife's urine sample from April 26, 2019, Plaintiff's wife suffered a loss of income derived from weightlifting-related grants, sponsorships, endorsements, and competitions. Plaintiff's wife also lost the opportunity to profit from her anticipated successful performance in the Tokyo 2020 Paralympics by way of, among other things, additional sponsorships, and other product endorsement opportunities.

20. In addition to the monetary losses suffered by Plaintiff's wife, she also lost the opportunity to compete in the 2020 Paralympics in Tokyo, in numerous other local and international competitions, and she suffered an enormous loss and damage to her reputation as a World-Renowned Para Weightlifting Champion.

21. By reason of having learned that her urine sample from April 26, 2019 had tested positive for the banned substance known as DHCMT Metabolite, and believing that the presence of such substance could <u>only</u> have come from her using the "dietary supplement" known as ANOGENIN, Plaintiff's wife had a sealed container of ANOGENIN tested by an approved Polish Anti-Doping Testing Laboratory in October 2019, the results of which testing revealed the presence, in the container of ANOGENIN, of both DHCMT Metabolite and Metandienone, which substances/drugs are both banned Anabolic Androgenic Steroids (AAS). Thus, the testing results for ANOGENIN from October 2019 confirmed Plaintiff's wife's suspicion and belief that

the source of the banned substance found to have been in her urine sample from April 26, 2019 was, and only could have been, from her consumption of BLACKSTONE's product ANOGENIN.

22. On April 8, 2020, Plaintiff's wife, through her attorneys in Poland, gave written notice to Defendant BLACKSTONE of the facts and circumstances relating to her having been disqualified and disciplined by reason of the prohibited substances having been found in Plaintiff's urine sample from April 26, 2019, as well as about such substances having been found to be present, although undisclosed in its product labelling and marketing, in BLACKSTONE's product known as ANOGENIN, which Plaintiff's wife had consumed in the period leading up to her participation in the Eger 2019 Para Powerlifting World Cup, in Hungary. In doing so, Plaintiff's wife, through her attorneys in Poland, also provided Defendant BLACKSTONE with copies of (a) the Test Report dated October 31, 2019, performed by an approved Polish Anti-Doping Testing Laboratory, which revealed the presence of both DHCMT Metabolite and Metandienone in BLACKSTONE's product ANOGENIN, and (b) the Decision of the Disciplinary Panel at the Polish Anti-Doping Agency in which a final determination of penalties and sanctions were imposed on Plaintiff's wife, over her objections, by reason of the presence of Metandienone, a banned Anabolic Androgenic Steroid, in her urine sample from April 26, 2019.

23. Defendant BLACKSTONE failed and refused to respond to Plaintiff's wife' written notice of April 8, 2020.

24. Plaintiff's wife is now deceased, having passed away on July 10, 2021 at the age of 35.

8

## B. OVERVIEW OF THE BANNED SUBSTANCES

25. Metandienone, also known as Methandienone or Methandrostenolone, is an androgen and anabolic steroid, and it is a prohibited and banned substance classified as an Anabolic Androgenic Steroid (AAS) by the World Anti-Doping Agency (WADA) on the WADA 2019 Prohibited List, as well as being banned by the United States Anti-Doping Agency, the NCAA and in countries in Western Europe, among them Poland and France..

26. Metandienone is known to bind tightly to and to activate the androgen receptor in order to exert its effects. These effects include dramatic increases in protein synthesis, glycogenolysis, and muscle strength over a short period of time. The drug is an agonist of the androgen receptor, which is the biological target of androgens like testosterone, and it has strong anabolic effects.

27. Metandienone had been marketed under the trade name "Dianabol" (among others) until 1983, when, following pressure from the FDA, it was withdrawn from the United States market by its manufacturer (CIBA). In 1985, generic production of Metandienone was shut down, when the FDA revoked Metandienone's approval authority entirely. In 1990, non-medical use of Metandienone was expressly outlawed in the United States under the Anabolic Steroids Control Act of 1990. Its legal status is that of a Schedule III Controlled Substance in the United States under the Controlled Substance Act.

28. Methandienone used over extended periods of time can result in liver damage from hepatotoxicity without appropriate precautions[1].

---

[1] https://journals.lww.com/acsm-csmr/fulltext/2018/03000/anabolic_steroid_effect_on_the_liver.8.aspx (last accessed on October 15, 2021)

29. Methandienone has many androgenic side effects such as increased facial/body hair growth, and estrogenic side effects such as gynecomastia and fluid retention[2]. The drug is also known to be capable of producing severe virilization in women.

30. Scholarly literature supports this conclusion as to Methandienone, finding that uncontrolled use of Methandienone, its physiological and psychoactive effects raise serious health implications with possible impact on athletes and doping practices[3][4].

31. The substance DHCMT Metabolite, dehydrochloromethyl-testosterone metabolite 4α-chloro-18-nor-17β-hydroxymethyl-17α-methyl-5α-androst-13-en-3α-ol, like Methandienone, is included on the World Anti-Doping Agency (WADA) 2019 Prohibited List under the class S1.1A Exogenous Anabolic Androgenic Steroids.

32. At no time did Plaintiff's wife knowingly ingest or consume Metandienone or DHCMT Metabolite and, in fact, the International Paralympic Committee, in doling out its penalties, concluded that the anti-doing rule violation assessed to Plaintiff's wife had been <u>unintentional</u> on the part of Plaintiff's wife and that the source of the prohibited substance was her use of a contaminated product, i.e., BLACKSTONE's product ANOGENIN.

---

[2] https://www.drugabuse.gov/publications/research-reports/steroids-other-appearance-performance-enhancing-drugs-apeds/what-are-side-effects-anabolic-steroid-misuse (last accessed on October 15, 2021)
[3] https://pubmed.ncbi.nlm.nih.gov/125133/ (last accessed on October 14, 2021)
[4] https://www.betterhealth.vic.gov.au/health/healthyliving/steroids#long-term-effects-of-anabolic-steroids (last accessed on October 15, 2021)

33. Indeed, the source of the Metandionone and DHCMT Metabolite found in Plaintiff's wife's urine sample from April 26, 2019 has been determined, as a result of testing performed of BLACKSTONE's product ANOGENIN, to be Plaintiff's wife's consumption of ANOGENIN during the three (3) months preceding the April 26, 2019 urine sample, which product ANOGENIN was found to contain both Metandionone and DHMCT Metabolite.

## C.  **BLACKSTONE'S PRODUCT ANOGENIN**

34. Sometime in 2018, Plaintiff's wife purchased containers of a product called ANOGENIN, which was sold, marketed and distributed by BLACKSTONE as a "Dietary Supplement" and the marketing and labelling of which product was represented by BLACKSTONE to "increase metabolism" and "build strength and muscle" while being "plant-based," "natural," "completely legal and safe," not containing any "prohormones and other androgenic products" and "does not increase testosterone levels."

35. The product's labelling, along with its marketing, identified Laxogenin as the primary ingredient, represented to be "natural" and "plant-based," and identified its other ingredients as being limited to: Magnesium Stearate, Silicon Dioxide and Titanium Dioxide.[5]

36. Significantly, the product labeling and its marketing made no mention of and failed to disclose that ANOGENIN contained other substances, including but not limited to the banned substances/drugs known as Metandienone and DHCMT Metabolite.

37. On BLACKSTONE's website, Defendant BRAUN stated and represented that

ANOGENIN: "doesn't affect natural testosterone production (meaning there's no need for post cycle therapy), but will significantly increase strength, power, performance, and body

---

[5] https://blackstonelabs.com/products/anogenin (last accessed on October 14, 2021)

composition in as little as 2-3 weeks! Natty or not, Anogenin belongs in any muscle-building stack".[6]

38. Defendants stated and represented on their website the following untrue and misleading

statement regarding ANOGENIN: "Every hard-training athlete wants to make gains in their performance and physique, but not every athlete wants to jump headfirst into the world of anabolics, where the rewards are monumental, but so are the risks. Blackstone Labs realizes that all athletes want to build muscle and increase performance and have created the ultimate all-natural muscle building supplement in Anogenin. Anogenin is a non-hormonal muscle builder to enhance strength, recovery, and lean muscle mass as well as decrease body fat levels. Anogenin is perfect for men and women as it won't affect your hormone levels but will significantly enhance your performance and physique"[7].

39. On BLACKSTONE's website, Defendant BRAUN stated and represented that

ANOGENIN is "anabolic and non-hormonal so you will build muscle slow and steady, it's a nutrient partitioner so if you are eating a proper diet you are going to utilize those calories lot better", "it is also anti-cortisol", "it has positive effects on estrogen too", "very safe product for anyone".[8]

---

[6] *Id.*
[7] *Id.*
[8] *Id.*

### D. __THE HISTORY OF BLACKSTONE'S ILLICIT BUSINESS PRACTICES__

40. Defendants have a history of having __knowingly__ defrauded and misled both the FDA and consumers, callously disregarding health risks and consequences to consumers of their products, and it is a matter of public record that they did so on a widespread basis, throughout the United States and internationally, in connection with numerous products, resulting in Defendant BLACKSTONE and Defendant BRAUN, among others, being indicted by the Federal Government for Conspiracy to Defraud the FDA, for the Introduction of Unapproved New Drugs Into Interstate Commerce and Conspiracy to Manufacture and Distribute a Controlled Substance, charges for which it is a matter of public record that Defendant BLACKSTONE and Defendant BRAUN both pleaded __GUILTY__ to Conspiracy to Distribute Controlled Substances and to the Sale of Unapproved New Drugs, and for which Defendant BLACKSTONE also pleaded __GUILTY__ to Conspiracy to Defraud the FDA and to Mail and Wire Fraud. (see U.S. Department of Justice Press Release No. 21-1157 dated November 19, 2021). In pleading GUILTY to such charges, Defendant BLACKSTONE and Defendant BRAUN both __expressly__ __admitted__ that BLACKSTONE had been formed "for the specific purpose of obscuring the sale of products marketed as dietary supplements that were tainted with anabolic steroids and therefore could not lawfully be sold."

41.  In their respective Factual Offers of Proof in Support of Guilty Pleas, Defendant BLACKSTONE and Defendant BRAUN both __expressly__ __admitted__, in pertinent part, that as to their business practices:

A. BLACKSTONE was formed by Defendant BRAUN (and one or more other co-conspirators) for the specific purpose of obscuring the sale of products marketed as

"dietary supplements" that were, in fact, tainted with anabolic steroids and, therefore, could not lawfully be sold;

B. BLACKSTONE, through its executives, including BRAUN, and its employees, knowingly conspired to defraud the FDA and to defraud consumers;

C. BLACKSTONE, through its executives, including BRAUN, and its employees, knowingly sold and directed others to sell unapproved new drugs, with the intent to defraud or mislead, in violation of the Food, Drug and Cosmetic Act;

D. BLACKSTONE advertised its illegal products on the internet and through email and social media, falsely representing to customers that the company's products were "legal" and were "dietary supplements;"

E. Email advertising was a major component of BLACKSTONE's sales, and that the marketing emails repeatedly falsely claimed that "All of our products are manufactured in FDA approved, registered and inspected facility that maintains GMP [Good Manufacturing Practices] certification and follows all FDA guidelines."

F. BLACKSTONE, through its executives, including BRAUN, and its employees, knew these statements to consumers were false, and were intended to convince consumers to buy BLACKSTONE's products;

G. BLACKSTONE'S advertisements falsely stated that "Our pro-anabolic compounds are all third party independently lab tested before encapsulation," when BLACKSTONE and BRAUN knew that BLACKSTONE's manufacturers were not, in fact, testing the raw ingredients before encapsulation;

H. BRAUN knew that there were risks to consumers taking BLACKSTONE's steroid products but nevertheless, and with the full understanding of the potential harm its

14

products could cause to consumers, BRAUN and BLACKSTONE distributed the illegal and dangerous products throughout the United States.

42. The prosecution of BLACKSTONE and BRAUN (and their co-conspirators) was the result of the Government having concluded that, since 2012, BLACKSTONE and BRAUN (and their co-conspirators) had engaged in a sophisticated scheme and pattern of conduct to market, promote and sell illegal products labeled as "dietary supplements" and under the guise of their being "safe" and "legal." ANOGENIN is one of such illegal products.

43. The Government concluded that BLACKSTONE and BRAUN (and their co-conspirators) had distributed illegal steroids, synthetic stimulants, mind-altering chemicals, and other muscle-building products, to all 50 states, and outside the United States as well, through their fraudulent scheme.

44. The Government concluded that BLACKSTONE and BRAUN (and their co-conspirators) avoided scrutiny by deceit and by shifting their sales to new unapproved or unsafe products to sustain their business and income.

45. On or about April 24, 2015, the FDA sent a "WARNING LETTER" to BLACKSTONE by reason of BLACKSTONE's labeling, marketing and sale of its product called "Angel Dust" as a "dietary supplement" which was found by the FDA to contain illegal ingredients and substances and to have been illegally introduced into interstate commerce. The WARNING LETTER issued to BLACKSTONE included the following:

"We request that you take prompt action to correct the violations cited above, as well as any other violations associated with your Angel Dust product **or other dietary supplement products marketed by your firm**, including any that contain DMBA. **We also remind you that the new dietary ingredient notification requirement applies to all dietary supplements that contain new dietary ingredients that have not been present in the food supply as articles used for food in a form in which the food has not been chemically altered. It is your responsibility to ensure that your firm complies with all requirements of federal law and FDA regulations."**

## COUNT I

### Breach of Implied Warranty of Merchantability

46. Plaintiff repeats, reasserts and realleges the allegations of Paragraphs 1-45 of this Amended Complaint with the same force and effect as of set forth at length herein.

47. Defendant BLACKSTONE is a manufacturer, marketer, distributor, promoter and seller of products offered for sale to the public and labelled as "Dietary Supplements."

48. One of the products manufactured, marketed, distributed, promoted and sold to consumers and labelled as a "Dietary Supplement" by Defendants is the product known as ANOGENIN.

49. Although manufactured, marketed, distributed, promoted, sold and labelled by Defendants as a "Dietary Supplement," and it is represented by Defendants to be "safe," "legal," "natural" and "plant-based," in reality ANOGENIN is neither a "Dietary Supplement" nor is it "safe" or "legal."

50. Rather, ANOGENIN does not meet the definition of a "Dietary Supplement" under the FDCA and it contains undisclosed, illegal, unsafe substances and drugs by the name of METANDIENONE and DHCMT METABOLITE, both of which are illegal Anabolic Androgenic Steroids (AAS) and Schedule III Controlled Substances.

51. Plaintiff 's wife purchased ANOGENIN sometime in 2018, and consumed it, in reliance upon Defendants' product labeling and representations that the product was a "Dietary Supplement," that it was "safe" and "legal" and that all of its ingredients were disclosed in the labelling, as required by law.

52. Plaintiff's wife purchased and consumed ANOGENIN in reliance upon Defendants' skill, judgment and representations, and in reliance upon the implied warranties of merchantability and fitness for its intended use as a "Dietary Supplement." BUT FOR Defendants' representations regarding the labelling, safety, purity, appropriateness, and quality of ANOGENIN, Plaintiff's wife would never have purchased or consumed it.

53. Defendants breached the implied warranties of merchantability and fitness for its intended purpose as a "Dietary Supplement" in that: ANOGENIN is not a "Dietary Supplement;" it is not "safe" or "legal;" it cannot be used "safely" as directed by Defendants; it had a deceptively false description and labelling; it could not pass without objection in the trade as to either its description or its ingredients; and it contains undisclosed, illegal and unsafe drugs and substances.

54. As a direct and proximate cause of Defendants' breach of implied warranties of merchantability and fitness for its intended purpose as a "Dietary Supplement," Plaintiff's wife was injured and harmed because she would neither have purchased nor consumed ANOGENIN but for Defendants' deception and misrepresentations as to the product's description, its ingredients, its fitness for use as a "Dietary Supplement," its being "safe" and "legal" and its containing only "natural" and "plant-based" ingredients.

55. As a direct and proximate cause of Defendants' breach of the implied warranties of merchantability and fitness for its intended purpose as a "Dietary Supplement," Plaintiff's wife was damaged because ANOGENIN has been found and determined to contain illegal and unsafe

and undisclosed substances/drugs known as METANDIENONE and DHCMT METABOLITE, both of which are illegal Anabolic Androgenic Steroids (AAS) and Schedule III Controlled Substances, as a result of which DHCMT METABOLITE was found to be present in a urine sample taken from Plaintiff's wife on April 26, 2019, following her having consumed ANOGENIN during the three (3) month period leading up to April 26, 2019, resulting in dire financial and other consequences for Plaintiff's wife, an accomplished and world-renowned athlete, including suspension from competitive events, the forfeiture of previous results and awards, monetary losses, damage to reputation, loss of endorsements, loss of scholarships and lost earning capacity.

56. Plaintiff's wife sustained damages as a direct and proximate result of Defendants' breaches of the implied warranties of merchantability and fitness for its intended purpose as a "Dietary Supplement" in regard to ANOGENIN in an amount to be determined at trial but reasonably believed to exceed $600,000.00 ($150,000.00 per annum for 2019-2022) and continuing.

## COUNT II

### Failure to Warn

57. Plaintiff repeats, reasserts and realleges the allegations of Paragraphs 1-56 of this Amended Complaint with the same force and effect as of set forth at length herein.

58. Defendants knew of the dangers posed by its product, ANOGENIN.

59. Defendants had a duty to warn consumers, among them Plaintiff, of the dangers related to ANOGENIN.

60. Defendants were negligent in relation to fulfilling their duty to warn consumers of ANOGENIN. Defendants' failure to warn consumers of the dangers of ANOGENIN resulted in injury to Plaintiff in regard to ANOGENIN in an amount to be determined at trial but reasonably believed to exceed $600,000.00 ($150,000.00 per annum for 2019-2022) and continuing.

## COUNT III

## Fraud

61. Plaintiff repeats, reasserts and realleges the allegations of Paragraphs 1-60 of this Amended Complaint with the same force and effect as of set forth at length herein.

62. Defendants have marketed, distributed and sold the product ANOGENIN as a "Dietary Supplement" with full knowledge that it does not, in fact, constitute a "Dietary Supplement" under the FDCA.

63. Defendants have willfully misrepresented ANOGENIN to be a "Dietary Supplement."

64. Defendants have willfully misrepresented ANOGENIN to be a "legal" and "safe" product.

65. Defendants have willfully misrepresented ANOGENIN to contain only "natural" and "plant-based" ingredients.

66. Defendants have willfully failed to disclose the presence in ANOGENIN of the illegal drugs known as METANDIENONE and DHCMT METABOLITE, both of which are illegal Anabolic Androgenic Steroids (AAS) and a Schedule III Controlled Substances.

67. Defendants have willfully failed to disclose the inherent health risks and dangers associated with METANDIENONE and DHCMT METABOLITE.

68. Defendants falsely market the company's products, among them ANOGENIN, as cutting-edge dietary supplements, designed to safely promote muscle growth and strength, and enhance physical and mental performance.

69. Defendants advertise illegal products on the internet and through email and social media, falsely misrepresenting to customers that the company's products are legal and are dietary supplements.

70. Defendants knew about the dangers associated with using METANDIENONE and DHCMT METABOLITE, and nonetheless intentionally failed to comply with the FDCA and other applicable regulations.

71. Plaintiff's wife would neither have purchased nor consumed ANOGENIN during the three (3) month period leading up to his urine sample on April 26, 2019 BUT FOR all of Defendants' purposefully false and misleading misrepresentations in regard to ANOGENIN being a "Dietary Supplement," "safe", "legal," "natural," "plant-based" and as to all of its ingredients having been identified and disclosed in its labelling and marketing.

72. The false and misleading statements and misrepresentations in regard to ANOGENIN were made by Defendants with knowledge of their falsehood.

73. The false and misleading representations were made by Defendants, upon which Plaintiff's wife reasonably and justifiably relied and were intended to induce and did induce Plaintiff's wife to purchase and consume ANOGENIN.

74. Defendants' purposefully misleading and deceptive practices caused harm to Plaintiff's wife.

75. As a direct and proximate result of the fraudulent conduct on the part of Defendants, Plaintiff's wife suffered a loss of income derived from weightlifting-related grants, sponsorships, endorsements, and competitions. Plaintiff's wife also lost the opportunity to profit from her anticipated successful performance in the Tokyo 2020 Paralympics by way of, among other things, additional sponsorships, and other product endorsement opportunities. In addition to the monetary losses suffered by Plaintiff's wife, she also lost the opportunity to compete in the 2020 Paralympics in Tokyo, in numerous other local and international competitions, and she suffered an enormous loss and damage to his reputation as a World-Renowned Para Weightlifting Champion.

76. Plaintiff's wife sustained damages as a direct and proximate result of Defendants' Fraudulent conduct and behavior, without regard to and with indifference for the consequences of such conduct and behavior on consumers of their illegal and unsafe products, among them ANOGENIN.

77. The Defendants' conduct, as described and detailed above, much of which Defendants BLACKSTONE and BRAUN have admitted to as part and parcel to pleading guilty in their criminal prosecution, demonstrates a high degree of moral culpability as well as being willful, wanton, reckless and/or malicious on their part. Both BLACKSTONE and BRAUN pleaded guilty to Conspiracy to Distribute Controlled Substances and to the Sale of Unapproved New Drugs, and

BLACKSTONE also pleaded <u>GUILTY</u> to Conspiracy to Defraud the FDA and to Mail and Wire Fraud. (see U.S. Department of Justice Press Release No. 21-1157 dated November 19, 2021). In pleading GUILTY to such charges, Defendant BLACKSTONE and Defendant BRAUN both <u>admitted</u> that BLACKSTONE had been formed "for the specific purpose of obscuring the sale of products marketed as dietary supplements that were tainted with anabolic steroids and therefore could not lawfully be sold."

78. Moreover, in their respective Factual Offers of Proof in Support of Guilty Plea,

Defendant BLACKSTONE and Defendant BRAUN both <u>admitted</u>, in pertinent part, that as to their business practices:

A. BLACKSTONE was formed by Defendant BRAUN (and one or more other co-conspirators) for the specific purpose of obscuring the sale of products marketed as "dietary supplements" that were, in fact, tainted with anabolic steroids and, therefore, could not lawfully be sold;

B. BLACKSTONE, through its executives, including BRAUN, and its employees, <u>knowingly</u> conspired to <u>defraud</u> the FDA and to defraud consumers;

C. BLACKSTONE, through its executives, including BRAUN, and its employees, <u>knowingly</u> sold and directed others to sell unapproved new drugs, with the intent to <u>defraud</u> or mislead, in violation of the Food, Drug and Cosmetic Act;

D. BLACKSTONE advertised its illegal products on the internet and through email and social media, <u>falsely</u> representing to customers that the company's products were "legal" and were "dietary supplements;"

E. Email advertising was a major component of BLACKSTONE's sales, and that the marketing emails repeatedly <u>falsely</u> claimed that "All of our products are manufactured

22

in FDA approved, registered and inspected facility that maintains GMP [Good Manufacturing Practices] certification and follows all FDA guidelines."

F.  BLACKSTONE, through its executives, including BRAUN, and its employees, <u>knew</u> these statements to consumers were <u>false</u>, and were <u>intended</u> to convince consumers to buy BLACKSTONE's products;

G.  BLACKSTONE'S advertisements <u>falsely</u> stated that "Our pro-anabolic compounds are all third party independently lab tested before encapsulation," when BLACKSTONE and BRAUN <u>knew</u> that BLACKSTONE's manufacturers were not, in fact, testing the raw ingredients before encapsulation; and

H.  BRAUN <u>knew</u> that there were risks to consumers taking BLACKSTONE's steroid products but nevertheless, and with the full understanding of the potential harm its products could cause to consumers, BRAUN and BLACKSTONE distributed the illegal and dangerous products throughout the United States.

79. Due to the results of the urine testing conducted of the sample taken on April 26, 2019, the results of which were revealed to Plaintiff 's wife on or about May 28, 2019, Plaintiff's wife was deemed to have committed anti-doping violations, as a result of which: she was  disqualified by the governing bodies from competing in weightlifting competitions for a period of one (1) year; she was suspended as a member of the Polish National Team; prior results that she had achieved in competitions were nullified; all points, medals and awards that she had previously received were nullified and forfeited; and the determinations of the Polish Anti-Doping Agency were made public.

80. As a direct and proximate result of the acts and omissions of Defendants, Plaintiff 's wife suffered a loss of income derived from weightlifting-related grants, sponsorships, endorsements, and competitions. Plaintiff 's wife also lost the opportunity to profit from her anticipated successful performance in the Tokyo 2020 Paralympics by way of, among other things, additional sponsorships, and other product endorsement opportunities. In addition to the monetary losses suffered by Plaintiff's wife, she also lost the opportunity to compete in the 2020 Paralympics in Tokyo, in numerous other local and international competitions, and she suffered an enormous loss and damage to her reputation as a World-Renowned Para Weightlifting Champion.

81. Plaintiff's wife sustained damages as a direct and proximate result of Defendants' morally culpable and willful, wanton, reckless and malicious behavior without regard to and with indifference for the consequences of such conduct and behavior on consumers of their illegal and unsafe products, among them ANOGENIN, which conduct on the part of Defendants does not merely approach criminality, but by Defendants' own admissions, does in fact constitute criminality, thereby warranting an award of Punitive Damages in this case.

82. By reason of the fraudulent, morally culpable, willful, reckless, wanton and malicious conduct on the part of Defendants, as to which Defendants have heretofore admitted in their criminal prosecution, in addition to compensatory damages in an amount to be determined at trial but reasonably believed to exceed $600,000.00 ($150,000.00 per annum for 2019-2022) and continuing, Plaintiff's wife is also entitled to an award of Punitive Damages against Defendants for the purpose of punishing Defendants for their exceedingly reprehensible behavior and conduct and to deter Defendants, and others in their industry, from repeating such behavior and conduct in the future, in an amount to be determined at trial but reasonably believed to exceed $500,000.00

.

## COUNT IV

### Magnuson-Moss Warranty Act, 15 U.S.C. §§2301, et seq.

83. Plaintiff repeats, reasserts and realleges the allegations of Paragraphs 1-82 of this

Amended Complaint with the same force and effect as of set forth at length herein.

84. Supplements are "consumer products" under 15 U.S.C. § 2301(1).

85. Plaintiff is a "consumer" under 15 U.S.C. § 2301(3).

86. Defendant is a "supplier" under 15 U.S.C. § 2301(4).

87. Defendant is a "warrantor" under 15 U.S.C. § 2301(5).

88. Supplements sold by Defendants, among them ANOGENIN, did not conform to the

Express Warranties made by Defendants because, in fact, Defendants marketed, distributed and

sold adulterated Supplements, among them ANOGENIN, rather than unadulterated Supplements

as Defendant expressly warranted.

89. By reason of Defendants' breach of warranties, Defendants violated the statutory rights

due Plaintiff 's wife under Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.,* thereby

damaging Plaintiff's wife.

90. Plaintiff's wife was injured as a direct and proximate result of Defendants' breach

because she would not otherwise have purchased the adulterated Supplement ANOGENIN if she

knew the truth about the product marketed, distributed and sold by BLACKSTONE.

91. Plaintiff's wife would neither have purchased nor consumed ANOGENIN during the

three (3) month period leading up to her urine sample on April 26, 2019 BUT FOR all of

Defendants' purposefully false and misleading misrepresentations in regard to ANOGENIN being

a "Dietary Supplement,"  "safe", "legal," "natural," "plant-based" and as to all of its ingredients having been identified and disclosed in its labelling and marketing.

92. Plaintiff's wife, to her detriment, consumed the adulterated Supplement ANOGENIN, sold by BLACKSTONE, so it would be futile to afford BLACKSTONE any opportunity to try to cure its failure to comply with its obligations under its written or implied warranty.

93. Within a reasonable time after discovering BLACKSTONE's breaches of warranty, Plaintiff's wife, through her attorney, acting on her behalf, gave written notice to BLACKSTONE of the breaches of warranty alleged herein.

94. By reason of the foregoing violations of the Magnuson-Moss Warranty Act on the part of Defendants in regard to ANOGENIN, Plaintiff, on behalf of his late wife, is entitled to be awarded all damages authorized under such statute.

## COUNT V

### Violation of N.Y. Gen. Bus. Law §349

95. Plaintiff repeats, reasserts and realleges the allegations of Paragraphs 1-94 of this Amended Complaint with the same force and effect as of set forth at length herein.

96. BLACKSTONE engaged in deceptive consumer practices in connection with its sale and delivery of adulterated Supplements, among them ANOGENIN, which it falsely identified as a "natural," safe" and "legal" "Dietary Supplement," in violation of New York General Business Law § 349.

97. Plaintiff seeks to enjoin the unlawful practices described herein, and to recover his actual damages and reasonable attorney's fees.

98. BLACKSTONE's acts and practices in violation of New York General Business Law Section 349 were likely to and, in fact, did mislead consumers, including Plaintiff's wife, acting reasonably under the circumstances.

99. BLACKSTONE's false representations and warranties concerning the nature and quality of the Supplement ANOGENIN purchased by Plaintiff's wife were materially misleading because the Supplement that BLACKSTONE sold contained illegal substances and drugs.

100. BLACKSTONE's false representations and warranties concerning the nature and quality of the Supplement ANOGENIN purchased by Plaintiff's wife had an adverse impact in consumers at large because those representations and warranties were directed to thousands of BLACKSTONE's customers over a number of years.

101. BLACKSTONE's conduct in selling adulterated Supplements to consumers in the United States and abroad, among them ANOGENIN, had an adverse impact on Plaintiff's wife and consumers at large because those representations and warranties were directed to millions of BLACKSTONE's customers over a number of years.

102. Plaintiff's wife was injured as a direct result of BLACKSTONE's actions and practices in violation of New York General Business Law Section 349 because she was misled into purchasing the adulterated Supplement ANOGENIN.

103.    By reason of such violations of Gen. Bus. Law §349, Plaintiff's wife was injured

and suffered actual damages in a sum to be determined at trial.

### Count VI

### Unjust Enrichment, Deceptive Practices and False Advertisement

104.    Plaintiff repeats, reasserts and realleges the allegations of Paragraphs 1-103 of this

Amended Complaint with the same force and effect as of set forth at length herein

105. BLACKSTONE and its agents, by selling adulterated Supplements, among them

ANOGENIN, committed wrongful and deceptive acts and, in doing so, were unjustly enriched and

caused financial and reputational harm to Plaintiff's wife

106. Selling adulterated Supplements on the part of BLACKSTONE was an act done with

an immoral purpose and BLACKSTONE and its agents had knowledge that the deceptive and

wrongful acts which were being committed exceeded the authority of the persons committing the

acts and that they were in violation of the law.

107.    BLACKSTONE and its agents were aware that they had a duty to sell unadulterated,

legal and safe Supplements to consumers, including Plaintiff's wife, with ANOGENIN being

among such products, and instead they intentionally failed to meet this obligation in that

BLACKSTONE and its agents knew that ANOGENIN contained Metandienone and DHCMT

Metabolite, ingredients that not only were not disclosed in its marketing and labelling, but which

are illegal and unsafe drugs that had no business having been included in a so-called "Dietary

Supplement."

## <u>COUNT VII</u>

### <u>Personal Liability on the Part of Defendant BRAUN</u>

108.  Plaintiff repeats, reasserts and realleges the allegations of Paragraphs 1-107 of this Amended Complaint with the same force and effect as of set forth at length herein

109. Defendant BRAUN is a Co-Founder of BLACKSTONE and, at all times pertinent herein, he controlled and/or participated in the business operations of BLACKSTONE and its agents in the business of selling, marketing and distributing products labelled and marketed as "dietary supplements," and doing so throughout the United States and internationally.

110.  In their respective Factual Offers of Proof in Support of Guilty Plea, Defendant BLACKSTONE and Defendant BRAUN both <u>admitted</u>, in pertinent part, that as to their business practices:

A.  BLACKSTONE was formed by Defendant BRAUN (and one or more other co-conspirators) for the specific purpose of obscuring the sale of products marketed as "dietary supplements" that were, in fact, tainted with anabolic steroids and, therefore, could not lawfully be sold;

B.  BLACKSTONE, through its executives, including BRAUN, and its employees, <u>knowingly</u> conspired to defraud the FDA and to defraud consumers;

C.  BLACKSTONE, through its executives, including BRAUN, and its employees, <u>knowingly</u> sold and directed others to sell unapproved new drugs, with the intent to defraud or mislead, in violation of the Food, Drug and Cosmetic Act;

D.  BLACKSTONE advertised its illegal products on the internet and through email and social media, falsely representing to customers that the company's products were "legal" and were "dietary supplements;"

E.  Email advertising was a major component of BLACKSTONE's sales, and that the marketing emails repeatedly falsely claimed that "All of our products are manufactured in FDA approved, registered and inspected facility that maintains GMP [Good Manufacturing Practices] certification and follows all FDA guidelines."

F.  BLACKSTONE, through its executives, including BRAUN, and its employees, <u>knew</u> these statements to consumers were false, and were intended to convince consumers to buy BLACKSTONE's products;

G.  BLACKSTONE'S advertisements falsely stated that "Our pro-anabolic compounds are all third party independently lab tested before encapsulation," when BLACKSTONE and BRAUN <u>knew</u> that BLACKSTONE's manufacturers were not, in fact, testing the raw ingredients before encapsulation; and

H.  BRAUN <u>knew</u> that there were risks to consumers taking BLACKSTONE's steroid products but nevertheless, and with the full understanding of the potential harm its products could cause to consumers, BRAUN and BLACKSTONE distributed the illegal and dangerous products throughout the United States.

111.  On BLACKSTONE's website, Defendant BRAUN stated and misrepresented that

ANOGENIN: "doesn't affect natural testosterone production (meaning there's no need for post cycle therapy), but will significantly increase strength, power, performance, and body composition in as little as 2-3 weeks! Natty or not, Anogenin belongs in any muscle-building stack."

112.  On BLACKSTONE's website, Defendant BRAUN stated and misrepresented

that ANOGENIN is "anabolic and non-hormonal so you will build muscle slow and steady, it's a

nutrient partitioner so if you are eating a proper diet you are going to utilize those calories lot

better", "it is also anti-cortisol", "it has positive effects on estrogen too", "very safe product for

anyone".

113.  Defendant BRAUN directly profited from his organization of, participation in

and control over the pattern and business model of deceptive and illegal actions taken by

BLACKSTONE as enumerated above.

114.  By reason of the foregoing, Defendant BRAUN is personally liable to Plaintiff

for all damages sustained by his wife as a consequence of BRAUN's organization of, participation

in, and direction and control over, the pattern and business model of deceptive and illegal actions

taken by BLACKSTONE as enumerated herein, and for which BRAUN has pleaded guilty to

having been a key leader of and participant in the criminal conspiracy to deceive and mislead both

the FDA and consumers, among them Plaintiff's wife, into purchasing its products, among them

ANOGENIN, in all 50 states and internationally, and based on having knowingly misrepresented

its products, among them ANOGENIN, to be a "dietary supplement," to be " safe" and "legal,"

and to not contain any undisclosed or illegal drugs or substances.

# **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays that this Court enter judgment against All Defendants as follows:

a) General Compensatory Damages in an amount consistent with the allegations contained herein and to be proven at trial, reasonably believed to exceed $600,000.00 ($150,000.00 per annum for 2019-2022) and continuing;

b) Special Damages in an amount consistent with the allegations contained herein and to be proven at trial;

c) Punitive Damages in an amount consistent with the allegations contained herein and to be proven at trial;

d) Reasonable Attorney's Fees, where applicable, in an amount consistent with the allegations contained herein and to be proven at trial,

e) Costs of suit incurred herein, and that Plaintiff be awarded such other costs and relief as the court deems just and equitable,

f) Investigative costs and expenses,

g) Both pre- and post-judgment interest on any amounts awarded.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.


Dated: Brooklyn, New York

      January 26, 2023

                                    Respectfully submitted,

                                      SABAJ LAW, P.C.

                                      By: <u>s/s *Paul T. Sabaj*</u>

                                      Paul T. Sabaj
                                      121A Nassau Ave
                                      Brooklyn, New York 11222
                                      Tel.: (212)-518-8270
                                      Fax: (888)-589-5514